# In the
# United States Court of Appeals
## For the Seventh Circuit

———————

No. 03-3961

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

LOUMARD HARRIS,

*Defendant-Appellant.*

———————

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 02 CR 177—**Larry J. McKinney,** *Chief Judge.*

———————

ARGUED JUNE 1, 2004—DECIDED JANUARY 11, 2005

———————

Before EASTERBROOK, KANNE and ROVNER, *Circuit Judges.*

ROVNER, *Circuit Judge.* Loumard Harris was charged with violating 18 U.S.C. § 922(g)(1), which prohibits felons from possessing guns. His first trial ended in a hung jury, but a jury convicted him at a second trial. Between the first and second trials, Harris had a falling-out with his court-appointed attorney and he asked for new counsel. The district court declined his request. The details of the conflict are not for the most part in the record of this direct appeal. Nevertheless Harris appeals his conviction on the grounds

that (1) the district court erred in denying his request for new counsel; (2) the denial resulted in ineffective assistance of counsel; and (3) section 922(g)(1) is an unconstitutional exercise of federal power over purely intrastate activities in contravention of the Commerce Clause. Reversals of convictions on direct appeal on the grounds of ineffective assistance of counsel are exceedingly rare in any court, and Judge Easterbrook noted at oral argument that none can be found in this Circuit. Having thoroughly warned the defendant and his lawyer of the steep uphill climb—a vertical climb, really—that they would have to make, they chose to go forward with this direct appeal even though its failure would mean the claims could not be brought later with a fully developed record in a petition for *habeas corpus*. That consequence now comes to pass as we affirm the judgment of the district court.

## I.

Harris continues to contest the government's version of the facts but the discrepancies will not make a difference to the resolution of the appeal. The felon-in-possession charge arose from a traffic altercation between Harris and David Fry, an acquaintance. When the two encountered each other on the road at 10 p.m. on March 30, 2002, they first exchanged heated words and then gunshots were fired. Fry called the police, Harris left the scene and a car chase ensued. Around this time, Officer Scott Childers was driving home from work. He was in uniform and in a marked police car when he heard a report over his radio that shots had been fired and that two vehicles were involved, approaching I-65 from I-70. Officer Childers then saw two vehicles traveling north on I-65 at 70 miles per hour. He fell in behind the gray Oldsmobile driven by Harris and activated his emergency lights and siren. Harris accelerated and then exited the expressway with Officer Childers in

close pursuit. Officer Childers lost track of the other car, but stayed with Harris. When Officer Childers was approximately one car length away, he saw Harris throw a gun out the driver's side window of the car as the car approached an intersection. The pistol landed in the grass just off the street and Officer Childers continued his pursuit of Harris. Harris stopped his car a few blocks after exiting the expressway and fled on foot. When Officer Childers caught up to Harris in the backyard of a house, the officer drew his weapon and ordered Harris to the ground. In 10 to 15 seconds, Officers Huff and McElfresh arrived to assist him. Harris admitted to the officers present that he had thrown the gun out of the car window. Childers then drove back to the intersection where he had seen Harris throw the gun and retrieved a semi-automatic pistol.

The gun had been manufactured in California and had been sold to Tamika Jones in March 2001 by a federally licensed firearms dealer. Several hours after Harris pitched the gun from his car window, in the early hours of the morning on March 31, 2002, Jones called the police department and reported the gun stolen, explaining that she noticed it was missing earlier that day. Jones was coincidentally an acquaintance of Harris, having known him for two or three years prior to these events. At the first trial, Jones testified that she did not mention Harris's name to the police when she made the report of a stolen gun that night. At the second trial, she claimed to have reported to police that Harris had been at her home the day she noticed the gun was missing. Nevertheless, she testified that she had been out shopping with her mother and a friend that day and returned home to find Harris visiting. Harris then drove Jones's mother and friend to the mother's home. Jones's mother reported that as she left the car, Harris confronted a man she did not know. She later heard gunshots after she entered her home.

The State of Indiana charged Harris with criminal reck-lessness, resisting law enforcement and possession of a hand-gun without a license. Harris entered a plea agreement to resolve those charges. Subsequently, on November 6, 2002, the federal government charged Harris with violating 18 U.S.C. § 922(g)(1), which criminalizes possession of a fire-arm by a felon. Harris was arrested on December 3, 2002, and on that same day, Federal Community Defender James McKinley was appointed to represent him. On April 3, 2003, another Federal Community Defender, Kimberly Robinson, also entered an appearance on Harris's behalf. Harris's first trial in early April 2003 ended in a hung jury and the declaration of a mistrial on April 8, 2003. Harris's defense at that trial had been that Fry, not Harris, had tossed the gun out of the car window. The case was set for retrial on June 16.

The record becomes very sketchy at this point but Harris claims that between April 8 and June 16, he sent a number of letters to the district court asking for a new lawyer.[1] He claims that McKinley tried to persuade him to enter into a plea agreement and when he refused, the relationship soured. The letters purportedly requesting new counsel are not in the record and Harris speculates that the district court discarded them. This is a curious claim because the

---

[1] More specifically, Harris claims that he began writing to the district court after McKinley refused to take certain steps that Harris asked of him. McKinley sent a letter to Harris on June 2 in response to Harris's letters (to McKinley) of May 14 and 21, explaining his disagreement with certain positions Harris wished him to take. If McKinley's letter marks the timing of his refusal, then it may be more accurate to say that Harris wrote letters to the district court between June 2 and June 14. Of course, because none of those letters are in the record, we cannot determine when or if Harris moved for new counsel prior to the start of the second trial.

district court appears to have retained every other letter
Harris sent, including one that he mailed before trial that
reached the court after the trial ended.[2] R. 49. Of course, be-
cause Harris insisted on bringing his claims about McKin-
ley's representation on direct appeal instead of in a collat-
eral proceeding, we have only his word about any of this. He
includes a copy of a June 2 letter he claims to have received
from McKinley but this letter is not necessarily admissible
evidence, and as far as we can tell, it was never evaluated
by a trier of fact. In any case, it does not mention Harris's
desire to have a new attorney. In the end, the only record
evidence we have of Harris's claim that he requested new
counsel is a colloquy between Harris and the court on June
16, the date his second trial was to begin. Because it is the
only record evidence and because the court's handling of the
motion is the main issue on appeal, we repeat the brief
colloquy here in its entirety:

| | |
|---|---|
| Mr. McKinley: | Your Honor, Mr. Harris has asked to address the Court. |
| The Court: | All right. |
| The Defendant: | Okay, I got a letter from Mr. McKinley in my case. I have issues to bring up he never brought up. Every time I ask him to do something it's always his best interest. No, sir, this is me. |

---

[2] This letter is dated June 4, 2003 and is postmarked June 5,
2003. However, the envelope is stamped "postage due" and the
Clerk's Office stamp on the envelope and letter indicate the letter
was received in that office on June 25, 2003. The letter, fashioned
as an affidavit, complains that defense counsel should ask for dis-
missal of the indictment and that "several other issues have also
gone unotice" [sic] but nowhere does Harris request that new
counsel be appointed or even hint that his relationship with his
lawyer is damaged beyond repair.

|                   | I'm facing 15 to life. This is in my best interest right now. I got the letter there sending over to me that he wasn't going to address issues and issues I knew meant something to my case. My case surrounded these issues. If— they used it for the indictment, for the grand jury, for the magistrate. He's telling me I can't use it. That's violatin' my constitutional right. |
|-------------------|---|
| The Court:        | What is that? |
| The Defendant:    | The proper (sic) cause, the transcripts from the detention hearing, the grand jury transcripts, it's everything. |
| The Court:        | You mean, you want those for yourself, those transcripts? |
| The Defendant:    | No, I got them for myself. I was askin' to bring it. He's tellin' me it's irrelevant to the cause right now. One time he told me they don't do proper cause in federal court, then he came back and contradicted and said yes, they do. He's not—he's not— I'm ready to go to trial but not with him. |
| The Court:        | You don't get your choice of lawyers, Mr. Harris. And Mr. McKinley is an excellent lawyer. He works in our— in and out this courthouse all the time. I'll deny your motion to remove him as your counsel. |
| The Defendant:    | Okay. You can say this because you're sittin' there. This is my life. |
| The Court:        | Mr. Harris, if you have a problem— after this case is over—with Mr. Mc- |

| | |
|---|---|
| | Kinley, you can always raise that in your appeal. But we're going to go to trial today. |
| The Defendant: | Sir, I'm sayin' this don't make sense. |
| The Court: | This is the date that was set for trial. You want to raise these issues, you— |
| The Defendant: | I wrote you letters. I sent you stuff over here telling you about these issue. I never got a response back. I wrote him letters— |
| The Court: | I can tell you this. The issues you raised with me were not the kind of issues that would lead me to conclude that your lawyer was not being competent in this case. When he tells you there are things irrelevant, he's probably right. |
| The Defendant: | I came here and look you right in the eye to eye and felt you—I think you're guilty, get you 188 to 235 plea agreement. How would you feel about that situation? |
| The Court: | Part of representation is trying to work out pleas, Mr. Harris. |
| The Defendant: | 188 months, 235 months, that's no plea, that's life. |
| The Court: | Well, you turned it down. |
| The Defendant: | So you're tellin' me you all gonna take me to trial? |
| The Court: | I'm telling you we're going to trial today. |

> The Defendant: You got witnesses. I rather have her represent me than him. I don't want this man as, as . . .
>
> The Court: You're ready for Kimberly Robinson to represent you in this case? Well, we're going to trial with the two of you in this case.
>
> Mr. McKinley: Thank you, Your Honor.
>
> The Court: You're welcome. You want to bring the government back in? I'll step down and you can bring in the jury.

R. 81, Tr. at 4-6.

Interestingly, many of Harris's subsequent letters and motions portray his June 16 in-court request as his first request for a new lawyer. *See, e.g.*, R. 50 (asking the court in a motion docketed July 17, 2003, to remove McKinley from the remainder of the proceedings due to conflict and stating, "The defendant bought [sic] this issue to The Honorable Larry J. McKinney['s] attention on June 16, 2003" and "now I'm asking once more for James C. McKinley to be removed."); R. 52 (in a letter received July 21, 2003, stating, "I'm writing to ask you once one [sic] as I did on 6-16-03 to remove public defender James C. McKinley from my proceedings"); R. 55 (in a letter filed August 21, 2003 "for the forth [sic] time asking to have James McKinley removed from my proceedings"); R. 58 (stating in a September 8, 2003 filing that he tried to present issues of counsel's ineffectiveness on June 16, 2003).[3] Nonetheless, Harris now claims

---

[3] Even after the court removed McKinley from participating in post-trial proceedings, Harris continued to focus on the June 16 oral motion in his missives to the court, stating, "On June 16, 2003 I was present in your Honorable court. Where I came before
(continued...)

that he brought the motion in advance of the trial date in letters that were not kept by the trial court.

Among Harris's numerous problems with McKinley were that (1) McKinley was too close to the government's lawyers and police witnesses and he refused to aggressively impeach those witnesses; (2) McKinley refused to place a detective's probable cause affidavit into evidence and point out discrepancies between the affidavit and current testimony of the arresting officers; (3) McKinley refused to request that jurors visit the exit ramp where the gun was found; and finally, (4) McKinley declined to call Lakisha Vaughn, a purported witness to Harris's arrest who he claims would dispute the officers' testimony that he confessed to throwing the gun from the window. Again, because the record is undeveloped, we must point out that there is no evidence in the record that McKinley had any close relationship with the government's lawyers and witnesses, and no evidence that McKinley even knew about Lakisha Vaughn (not to mention a complete lack of evidence regarding what Vaughn would have said if called to testify). McKinley's purported June 2 letter to Harris is his best evidence that McKinley refused to challenge the probable cause affidavit and refused to request that the jury be taken to view the scene of the crime.

As we noted above, the district court denied Harris's oral motion for new counsel on the day the second trial began. In addition to McKinley, Kimberly Robinson represented Harris at the second trial. The jury convicted Harris this time, after a trial in which the government concedes that a witness who changed her story between trials was not

---

[3] (...continued) you and ask[ed] to have my appoint[ed] counsel James C. McKinley to remove [sic] from my proceedings due to conflict and ineffectiveness." R. 59. *See also* R. 60/61 and R. 78.

impeached on that point. Harris, who had testified at his first trial, did not testify at the second trial. As might be expected, there were other differences between the first and second trials but none prove relevant to the issues here. The court subsequently granted Harris's renewed motion for new counsel on September 5, 2003, removing McKinley from participation in post-trial proceedings. Harris appeals.

## II.

On appeal, Harris argues that the district court abused its discretion and thereby violated his Sixth Amendment right to effective assistance of counsel when it denied his motion for new counsel. He also challenges whether section 922(g) could be constitutionally applied to the facts of his case where his possession of the gun did not affect interstate commerce. We will address his Sixth Amendment claim in two parts, first considering whether the district court abused its discretion in denying Harris's motion for new counsel and then addressing whether the denial of the motion resulted in ineffective assistance of counsel. But first we will turn to his section 922(g) claim, which is well-settled in this jurisdiction.

## A.

Harris challenges his section 922(g) conviction on the grounds that Congress may not constitutionally regulate his wholly intrastate possession of a gun under the Commerce Clause. He contends that the gun's manufacture in another state is an inadequate interstate connection under the Supreme Court's reasoning in *United States v. Lopez*, 514 U.S. 549 (1995) and *Jones v. United States*, 529 U.S. 848 (2000). We need not dwell on this issue for long because as Harris concedes, we have already resolved this issue in prior appeals and Harris offers us no compelling reason to

change our prior rulings. *See United States v. Thompson*, 359 F.3d 470, 480 (7th Cir. 2004) (rejecting an identical Commerce Clause claim based on *Lopez* and *Jones* and collecting cases where we rejected similar or identical claims); *United States v. Harris*, 325 F.3d 865, 873-74 (7th Cir. 2003) (finding that *Lopez* and *Jones* did not implicitly overrule *Scarborough v. United States*, 431 U.S. 563, 577 (1977), where the Supreme Court held that proof that a firearm had previously crossed state lines was adequate to show that possession of the gun was "in or affecting commerce"); *United States v. Lemons*, 302 F.3d 769, 771-72 (7th Cir.), *cert. denied*, 537 U.S. 1049 (2002) (same); *United States v. Wesela*, 223 F.3d 656, 659-60 (7th Cir. 2000), *cert. denied*, 531 U.S. 1174 (2001) (finding that nothing in *Jones* or *Lopez* casts doubt on the validity of section 922(g)). Harris reports that he raised this argument in order to preserve it in the event the law on this issue changes. He may consider it preserved. We decline his invitation to change the law.

## B.

We next consider Harris's ineffective assistance claim based on the district court's refusal to appoint new counsel for the second trial. "If the defendant has been given an opportunity to explain to the court the reasons behind his request for substitute counsel, we review the denial of that request only for an abuse of discretion." *United States v. Bjorkman*, 270 F.3d 482, 500 (7th Cir. 2001), *cert. denied*, 535 U.S. 1095 (2002). *See also United States v. Brown*, 79 F.3d 1499, 1505 (7th Cir.), *cert. denied*, 519 U.S. 875 (1996) (choice of counsel rulings by the district court are reviewed on appeal for abuse of discretion); *United States v. Zillges*, 978 F.2d 369, 371 (7th Cir. 1992) (provided the defendant was afforded an opportunity to explain the reasons behind his request, our review of the denial of a motion for substitution of counsel is reviewed for abuse of discretion). As the

transcript above demonstrates, McKinley brought the issue to the court's attention and a brief hearing was held outside the presence of the government and the jury. At that time, the district court solicited the reasons for Harris's dissatisfaction with McKinley and we therefore review the denial of the motion for substitute counsel for abuse of discretion.

In determining whether the district court abused its discretion in denying a motion for substitute counsel, we consider a number of factors including the timeliness of the motion, the adequacy of the court's inquiry into the motion, and whether the conflict was so great that it resulted in a total lack of communication preventing an adequate defense. *Bjorkman*, 270 F.3d at 500; *Brown*, 79 F.3d at 1505-06; *Zillges*, 978 F.2d at 372. If we find an abuse of discretion, we will nonetheless affirm the district court's decision unless the defendant establishes that he was deprived of his Sixth Amendment right to effective assistance of counsel. *Bjorkman*, 270 F.3d at 500; *Zillges*, 978 F.2d at 372-73 (if a defendant is still afforded adequate representation, an erroneous denial of a motion for substitution is not prejudicial and is therefore harmless). The Sixth Amendment right to counsel includes the right to choice of counsel. *Brown*, 79 F.3d at 1505. "However, this right must be understood with regard to its function in our constitutional scheme, especially where indigent defendants are concerned." *Brown*, 79 F.3d at 1505.

> Thus, while the right to select and be represented by one's preferred attorney is comprehended by the Sixth Amendment, the essential aim of the Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers.

*Wheat v. United States*, 486 U.S. 153, 159 (1988). With these standards in mind, we turn to the particulars of Harris's situation.

On this record, Harris's timeliness claim could not be weaker. Although he claims to have moved for new counsel in letters sent to the court before the date of trial, the only record evidence reveals that he first brought the motion for substitution of counsel on the day his second trial was to begin.[4] As recounted above, his subsequent letters to the court confirm that he first raised the motion on June 16, moments before the jury was impaneled. The district court's remarks indicate a belief that Harris was bringing the motion at that late date for the purpose of delay. Three times the court informed Harris that "we're going to trial today." R. 81, Tr. at 4-5. It is difficult to determine exactly when the supposed rift formed and thus impossible to tell if Harris could have brought the motion earlier. Harris claims the rift formed when McKinley attempted to talk him into a plea. Nothing in the record tells us when these discussions regarding a plea took place. McKinley's June 2 letter does not mention any discussion of a plea or any rift between lawyer and client. The letter that Harris mailed to the court on June 5 that reached the court (postage due) on June 25 after the conclusion of the second trial makes no mention of plea discussions or any rift between Harris and McKinley. The letter simply states that Harris would like to raise certain issues and has discussed these issues with his lawyer. On this record, we can only conclude (as the district court implicitly did) that the motion for new counsel was untimely. *See United States v. Wilks*, 46 F.3d 640, 643 (7th Cir. 1995) (motion for new counsel untimely when not raised prior to commencement of second trial). *See also*

---

[4] Harris argues that the district court acknowledged during the colloquy receiving these letters. As we explain *infra* at 14-15, the court's comments can be construed many ways, and in any case, the letters are not part of the record on appeal. On this undeveloped record, we have no way to verify the content of the letters. In the absence of any evidence, we decline Harris's invitation to assume the letters contained requests for a new attorney.

*United States v. Huston*, **280 F.3d 1164, 1167 (7th Cir. 2002)** (affirming court's denial of motion for new counsel where defendant conceded that motion was untimely when made on the morning of the trial, and commenting further that lack of genuine motive combined with timing could have resulted in outright dismissal of motion for untimeliness).

We turn to the adequacy of the court's inquiry into the motion. We have reproduced the entire exchange between Harris and the district court above. Although the colloquy may not be a model of probing inquiry, the district court elicited from Harris all the major reasons he sought new counsel. Indeed, he makes no claim now that there were additional reasons he wished to express but was prevented from raising. The court gave him every opportunity to state his reasons. He rests now on the rationales he raised on June 16, namely (1) that McKinley was refusing to raise certain legal issues that Harris believed had merit; and (2) that Harris lost confidence in McKinley when McKinley encouraged him to accept a plea agreement, perhaps indicating that McKinley did not believe in his client's innocence.

Harris complains that the district court's inquiry was inadequate in part because the court ignored his letters. Again, these letters are not part of the record in this direct appeal and we cannot confirm their existence much less their content. Harris characterizes the court's remarks as an acknowledgment of having received letters. The court's comments can be read many ways, however, and because Harris has refused to take the issue up on collateral review, we will never know what the district court meant when it said, "The issues you raised with me were not the kind of issues that would lead me to conclude that your lawyer was not being competent in this case." The court could have meant the issues Harris raised seconds earlier, or in an earlier in-court proceeding, or in one of the elusive letters Harris now claims to have written. We will never know for

certain, but the court did not clearly indicate it received any letters, there are no pre-trial letters in the record (other than as noted above), and we cannot conclude that the court ignored letters that on this record do not exist.

Harris next compares his circumstances to those in *Zillges*, where we found the court's inquiry inadequate. We found the inquiry inadequate there because "[a]lthough the district court did engage in an initial inquiry into Zillges's complaint, the court sought to elicit a general expression of satisfaction on the part of Zillges with his trial counsel rather than reasons for his dissatisfaction with counsel." Here the court elicited the reasons for Harris's dissatisfaction. Harris does not claim that he had additional reasons that did not come to light, only that the court should have delved further into the reasons and should have questioned McKinley as well. Ideally, the court should have questioned Harris's lawyer to determine the existence and extent of the alleged rift. *Zillges* seems to require as much. Our reading of the colloquy reveals that the court uncovered the reasons for Harris's dissatisfaction and then halted the discussion for another reason. Harris told the court he was ready to go to trial with Kimberly Robinson, the other attorney who was representing him. The court determined that the trial would therefore go forward with Harris being represented by both McKinley and Robinson. This shift in the court's attention is more appropriately addressed below in our consideration of prejudice. We need not decide in the interim whether the court should have inquired further into the breakdown in the lawyer-client relationship at that point in time. We thus decline to find whether the inquiry was inadequate.

The final factor is whether the conflict was so great that it resulted in a total lack of communication preventing an adequate defense. On this point, Harris concedes the record is nearly devoid of evidence but he argues that the lack of evidence should not be held against him because it was the

result of an inadequate inquiry by the district court. Again, although the inquiry was not ideal, it did reveal that Harris lost trust in McKinley because McKinley seemed to believe that Harris was guilty and should take a plea agreement. Nothing in the record specifically addresses the communication between Harris and McKinley at the second trial. We know from McKinley's June 2 letter that Harris and McKinley corresponded between the first and second trials and also met in person to discuss the second trial. The record also reveals that Harris and McKinley discussed whether Harris would testify at the second trial as he had done at the first. The pre-trial meetings and correspondence combined with the discussion about testifying belie the claim that communication was so lacking that McKinley was unable to prepare an adequate defense. Note that this was the second trial of the same matter and that the defense McKinley presented at the first trial resulted in a hung jury. Ideally, under *Zillges*, the district court should have questioned McKinley on this point, but again, we need not reach this issue because we can resolve the case on the prejudice issue.

As we noted above, even if the district court abused its discretion in denying the motion for new counsel, we will nonetheless affirm the district court's decision unless the defendant establishes that he was deprived of his Sixth Amendment right to effective assistance of counsel. *Bjorkman*, 270 F.3d at 500; *Zillges*, 978 F.2d at 372-73. Moreover, "the essential aim of the Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers." *Wheat*, 486 U.S. at 159; *Brown*, 79 F.3d at 1505. On this point, Harris loses his appeal.[5]

---

[5] At least in part, Harris was represented by a lawyer of his choice, Kimberly Robinson. Robinson was able and willing to par-
(continued...)

In order to succeed on a claim of attorney ineffectiveness, Harris must demonstrate both that his counsel's conduct fell below an objective standard of reasonableness and that his counsel's sub-standard performance prejudiced him. *Hampton v. Leibach*, 347 F.3d 219, 246 (7th Cir. 2003) (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). In order to satisfy the first prong of the *Strickland* test, Harris must show that his attorney's "representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 687-88. *See also Bruce v. United States*, 256 F.3d 592, 597 (7th Cir. 2001) (to prevail on performance prong of an ineffective assistance claim, defendant must show that counsel's deficient performance fell below an objective standard of reasonable competence); *Zillges*, 978 F.2d at 373 (to meet first part of ineffective assistance claim, defendant must demonstrate that the performance of his attorney was not within the range of competence demanded of attorneys in criminal cases). In assessing the adequacy of counsel's performance, the court's scrutiny must be highly deferential, allowing ample room for differences of professional opinion among attorneys as to how one might best represent the defendant. *Hampton*, 347 F.3d at 246; *United States v. Trevino*, 60 F.3d 333, 338 (7th Cir. 1995), *cert. denied*, 516 U.S. 1061 (1996) (because counsel is presumed effective, a party bears a heavy burden in making out a

---

[5]  (...continued)
ticipate in the proceedings. She appears to have cross-examined at least two government witnesses and otherwise participated in the trial. Harris has not complained at all about Robinson's performance at or before trial. She was "an effective advocate" and was also a lawyer with whom Harris was willing to go to trial. We will not rely solely on her participation in the trial to find that Harris's claim fails because her presence may not have ameliorated the prejudice of any ineffective assistance by her co-counsel McKinley. For that reason, we will consider fully Harris's complaints about McKinley.

winning claim on ineffective assistance). The prejudice prong is met if a defendant can show that, but for counsel's unprofessional errors, there is a reasonable probability that the result of the proceeding would have been different. *Hampton*, 347 F.3d at 246; *Trevino*, 60 F.3d at 338 (after the defendant directs the appellate court to specific acts or omissions making up the ineffective assistance claim, we must determine whether, in light of all the circumstances, the alleged acts or omissions were outside the wide range of professionally competent assistance).

Harris's complaints about McKinley's performance at the second trial are as follows: (1) McKinley failed to impeach Officer Emily Huff, Tamika Jones and David Fry with what he considered to be prior inconsistent testimony; (2) McKinley failed to call additional potentially exonerating witnesses (he identifies only one in his brief—Lakisha Vaughn); and (3) McKinley refused to request that the jury visit the I-65 exit ramp where the gun was ejected from the window of a car. We can address the last two points very quickly. Harris does not even attempt to demonstrate the value of having the jury visit the exit ramp, much less demonstrate the prejudice he suffered when McKinley declined to arrange such a visit. The jury viewed three photographs, a diagram and a map of the exit ramp. Gov't Ex. 16; Defendant's Exs. A, B, C and D. Harris does not explain what additional information could be gleaned from a personal visit to the scene much less how the absence of that information prejudiced his case. As for Lakisha Vaughn, on this record we are unable to determine who she is or what her testimony would have been. Needless to say, we cannot determine the value of this alleged testimony or the prejudice caused by its absence. Moreover, we have no idea why McKinley chose not to pursue Vaughn as a witness. The record is silent and we decline to fill in the blanks

based solely on Harris's representations in his briefs.[6] *See United States v. Farr*, 297 F.3d 651, 658-59 (7th Cir. 2002) (a defendant is unable to demonstrate that his lawyer's failure to interview certain witnesses prejudiced him when the record is devoid of evidence on the value of the witness's testimony because the defendant brought his ineffective assistance claim on direct appeal).

We turn to the impeachment issues. Recall that Officer Huff arrived on the scene after Officer Childers cornered Harris in a backyard following a foot chase. Huff testified consistently at both trials that Harris spontaneously admitted to the officers present that he had thrown the gun out of his car window. Harris's complaints about changes in Officer Huff's testimony between the first and second trial involve such trivial and collateral matters that we can imagine any number of strategic reasons why McKinley did not try to "impeach" Huff on these matters. His failure to do so did not amount to ineffective assistance. Harris's problems with David Fry's testimony are no more significant. The only two discrepancies in Fry's June testimony as compared to his April testimony are that (1) in June, he testified there was a woman in the car with him during the chase, but in April he made no such claim; and (2) in April, he claimed to have pulled over to the right side of the ramp as he exited I-65 so that Childers could pass and in June he claimed to have pulled over to the left. Again, these matters are both trivial and collateral to the matter being tried. We can think of myriad reasons why McKinley did not try to

---

[6] Harris also complains about McKinley's failure to impeach Detective Paul Arkins regarding representations he made in the probable cause affidavit here. At trial, Arkins testified only regarding Harris's prior felony conviction. The information contained in the probable cause affidavit was based on oral or written reports from other officers. Attempting to impeach Arkins on these issues would not have changed the outcome of the trial.

"impeach" Fry on whether he pulled left or right. He had already impeached Fry quite effectively with two prior convictions, one for possession of cocaine and the other for assault and battery. He also pointed out to the jury that because Fry was a convicted felon, he could not legally possess a gun and thus had a motive to lie about who ejected a gun onto the shoulder of the exit ramp. Any failure to impeach Fry on these trivial matters did not constitute ineffective assistance. *See United States v. Rezin*, 322 F.3d 443, 446 (7th Cir. 2003) (there is a tactical reason not to make weak arguments because they distract the court from stronger arguments); *Trevino*, 60 F.3d at 339 (failure to quibble with fingerprint expert on trivial points regarding methodology was not ineffective assistance when counsel pursued a more effective path of questioning about the absence of fingerprints on certain items and the tendency of prints to remain visible long after an item is touched).

Finally, we consider the testimony of Tamika Jones, the owner of the firearm who was an acquaintance of Harris's. In the first trial, Jones was asked whether her mother and Tim Gray were at her house on March 30. She affirmed that they were present. She was not asked at the first trial if Harris was also present that day. In June, she added that Harris had also been to her home the day she reported the gun missing. This additional testimony was not inconsistent with her April testimony but simply added to it. In June, Jones's mother corroborated this fact when she testified that she too had seen Harris at Jones's house that day and that he had given her (the mother) a ride home. There was no need for McKinley to point out this imagined inconsistency to the jury. The government concedes there was one change in Tamika Jones's testimony between April and June. In April, she testified that when the police came to take the report about her missing gun, she did not mention to them that Harris had been present in her home that day. At the June trial, she testified that she did tell the police

officers taking the report that Harris had been in her home that day. The government argues that impeaching Jones on this point would have little impact on the outcome of the trial and we tend to agree. Harris does not deny that he was an acquaintance of Jones and does not challenge her mother's testimony placing him at the house the evening before she reported the gun missing. To find Harris not guilty, the jury would have had to overlook an incredible coincidence that the gun found on the side of the road after a car chase involving Harris belonged to a friend who reported that gun missing hours after Harris's arrest. Perhaps McKinley did not impeach Jones on this point because he did not want to dwell on a witness who brought forward this damning coincidence. Considering the totality of evidence against Harris as well as the very able cross-examinations conducted by McKinley, we cannot say that failing to impeach Jones on this point amounted to ineffective assistance of counsel. In none of these instances can we find a reasonable probability that the result of the proceeding would have been different if McKinley had taken the actions Harris wished him to take.

## III.

We cautioned Harris's counsel at oral argument against raising a claim of ineffective assistance on direct appeal rather than bringing it on collateral review where a complete record can be made to support the claim. Each of the judges on the panel cautioned counsel on the perils of going forward with the claim at this stage of the appeals process, especially in light of this Court's history of declining to reverse convictions in these circumstances. *See Trevino*, 60 F.3d at 339 (noting that, as of the date of that opinion, this Court had never reversed a conviction on direct appeal because of ineffective assistance of counsel). The difficulties of proceeding with an ineffective assistance claim on direct

appeal are well documented. *See Farr*, 297 F.3d at 657 (ineffective assistance claims are best raised in motions for *habeas corpus* rather than direct appeal because such claims are unlikely to find any factual support in the trial record); *United States v. Hall*, 212 F.3d 1016, 1021 (7th Cir. 2000) (ineffective assistance claims on direct appeal are generally frowned upon because they involve inquiries into facts not usually found in the trial record such as an attorney's trial strategies); *United States v. Godwin*, 202 F.3d 969, 973 (7th Cir.), *cert. denied*, 529 U.S. 1138 (2000) (because appellate inquiry must be confined to record as it stands, direct appeals of ineffective assistance claims are invariably doomed); *Trevino*, 60 F.3d at 338 (direct review of ineffective assistance claims is difficult because they require inquiry into motivation behind attorney's strategy which in turn requires inquiry into facts that are not part of the trial record); *United States v. Boyles*, 57 F.3d 535, 550 (7th Cir. 1995) (direct review of ineffective assistance claims inappropriate because of inadequate development of record); *United States v. Davenport*, 986 F.2d 1047, 1050 (7th Cir. 1993) ("a defendant who presents an ineffective-assistance claim for the first time on direct appeal has little to gain and everything to lose"). Yet even after our warnings in these cases, claimants continued to raise ineffective assistance claims on direct appeal, for a time out of concern that they might procedurally default the claim by not raising it at the earliest opportunity.

The Supreme Court removed that worry recently. *Massaro v. United States*, 538 U.S. 500, 123 S. Ct. 1690 (2003). The Court recognized that "[w]hen an ineffective-assistance claim is brought on direct appeal, appellate counsel and the court must proceed on a trial record not developed precisely for the object of litigating or preserving the claim and thus often incomplete or inadequate for this purpose." *Massaro*, 538 U.S. at 504-05, 123 S. Ct. at 1694. The Court noted that for an error of commission, an

appellate court will have "no way of knowing whether a seemingly unusual or misguided action by counsel had a sound strategic motive or was taken because counsel's alternatives were even worse." 538 U.S. at 505, 123 S. Ct. at 1694. Moreover, the "trial record may contain no evidence of alleged errors of omission, much less the reasons underlying them." 538 U.S. at 505, 123 S. Ct. at 1694. And without a more developed record, an appellate court may not be able to determine whether an alleged error (of commission or omission) was prejudicial. 538 U.S. at 505, 123 S. Ct. at 1694. For this reason, the Supreme Court set aside the usual rules of procedural default and held that an ineffective assistance of counsel claim may be brought in a collateral proceeding under section 2255 whether or not the petitioner could have raised the claim on direct appeal. *Massaro*, 538 U.S. at 504, 123 S. Ct. at 1694. After *Massaro*, only the rarest and most patently egregious of ineffective assistance claims are appropriately brought on direct appeal because there is no risk to delaying until a fully developed record is made.[7] Harris's complaint about McKinley does not come even close to qualifying for this aggressive treatment.

The danger of bringing the claim too soon should be obvious. We note the downside here for completeness. Once the claim has been rejected on direct appeal, that decision will be binding on the district court through the law of the case doctrine. *Trevino*, 60 F.3d at 338; *United States v. South*, 28 F.3d 619, 629 (7th Cir. 1994). *See also Harris v. United States*, 366 F.3d 593, 595 (7th Cir. 2004) (appellate court's rejection of defendant's ineffective assistance claim on direct appeal is binding on post-conviction review). That

---

[7] We would not paternalistically prohibit defendants and their lawyers from bringing these claims on direct appeal. Conceivably, there might be a case where the trial lawyer's incompetence and the prejudice to the defendant is apparent on the face of the black and white record.

leaves the defendant with the unenviable task of convincing a district court to disregard our prior ruling. *Trevino*, 60 F.3d at 338; *South*, 28 F.3d at 629. No amount of later fact-finding will be able to repair the damage that is done when we are forced to rule prematurely on an ineffective assistance claim.

Mindful of the permanent effect of forcing our hand at this stage of the proceedings, and not wishing to pressure counsel into making a hasty decision about whether and how to proceed, we allowed counsel a week to consult with his client and inform the court whether he wished to withdraw the appeal. The reply came shortly:

> Loumard Harris wishes to continue his prosecution of this appeal. He does so with the knowledge that an adverse decision on this appeal may prejudice future efforts to raise his claims in a subsequent proceeding. However, Mr. Harris believes that the record on this appeal is sufficient to demonstrate both: (1) the objective unreasonableness of his counsel's performance; and (2) that he was prejudiced by his counsel's failures. . . . To the extent this Court disagrees, and believes there are holes in the evidentiary record that prevent it from properly considering his claims, Harris submits the proper course of action is to remand the case to the District Court with instructions to conduct an evidentiary hearing that will permit the compilation of a sufficient record.

Appellant Loumard Harris's Supplemental Submission, at 1-2 ("Supplemental Submission").

Harris clarified in his Supplemental Submission that he believes remand is appropriate both to obtain a proper hearing on his motion for new counsel and to make a record on his claim for ineffective assistance. *See* Supplemental Submission at 2. These requests for remand in the Supplemental Submission were the first time in the appeal

that Harris requested remand for evidentiary hearings. Prior to this time, he simply implored us to construe the facts in his favor in the absence of any evidence supporting his claims, in essence to take his word for it. These requests for remand come absurdly late in the appeals process and we will consider them waived because they were not raised in the opening brief (or even in the reply brief). *See United States v. Matchopatow*, 259 F.3d 847, 851 (7th Cir. 2001) (arguments not raised until the reply brief are waived); *Godwin*, 202 F.3d at 973 (this Court's inquiry into the ineffective assistance claim must be confined to facts that appear in the record as it stands at the time of the appeal). Although he mentions in his opening brief that the district court erroneously denied his *pro se* post-trial motion for a new trial, his brief contains no argument and no citation to any case law on this point. At no time does he argue that the court erred in denying him an evidentiary hearing on this *pro se* motion. He focuses his briefs entirely on the district court's purported abuse of discretion in denying his motion for new counsel which, he argues in turn, denied him effective assistance of counsel.

If Harris wanted to build a record, he should have taken our very strong hints and withdrawn his claim for ineffective assistance of counsel so that he could pursue the matter in a collateral proceeding. He declined our invitation and he is left with the trial record as the only source of evidence in his appeal. To the gaps we have already pointed out, we add the following partial list of things we will never know because Harris chose this ill-advised path: (1) whether McKinley had any strategic reasons for the course of action he took at trial; (2) whether Robinson concurred in McKinley's decisions; (3) whether Harris really requested new counsel before the start of the second trial in the mysteriously missing letters; (4) whether McKinley pursued an investigation into evidence that could have been offered by Lakisha Vaughn; and (5) what Vaughn would have said

had she been called to testify at trial. Because Harris chose to bring the claim on direct appeal and because he did not request a timely remand for fact-findings, these gaps in the record are his own failing. Given that Harris is unable to demonstrate on this record that he was deprived of the effective assistance of counsel, we hold that Harris was not prejudiced by any error in the denial of the motion for new counsel.

## IV.

After the court heard oral argument in this case, Harris requested leave to file a supplemental brief to address the impact of *Blakely v. Washington*, 124 S. Ct. 2531 (2004) and *United States v. Booker*, 375 F.3d 508 (7th Cir. 2004), on his sentence. We granted leave and invited the government to respond. In his supplemental brief, Harris argues that the Sentencing Guidelines are unconstitutional *in toto*, and that he was prejudiced by the court's application of the Guidelines to his conviction. He requests that we vacate his sentence and remand to the district court to either (1) recalculate his sentence in a manner consistent with *Blakely*; (2) select an alternative sentence not based on the Guidelines; or (3) allow the parties an opportunity to address the constitutionality of the Guidelines as a whole. In response, the government expresses its disagreement with our decision in *Booker*, but argues that, in the end, *Blakely* and *Booker* do not apply to Harris's sentence. According to the government, Harris's sentence was increased based solely on his uncontested prior criminal convictions under U.S.S.G. § 4B1.4(b)(3)(B), the career offender provision. The government contends that *Apprendi v. New Jersey*, 530 U.S. 466 (2000), explicitly excluded prior convictions from its holding that a jury must decide any fact that increases the statutory maximum sentence. Because *Blakely* and *Booker* depend on *Apprendi*, the government reasons, there was no

need to plead the fact of prior convictions and prove those convictions to the jury beyond a reasonable doubt.

We recently addressed this same scenario in *United States v. Pittman*, 388 F.3d 1104, 1108-10 (7th Cir. 2004). We noted that prior to *Apprendi* or *Blakely*, the Supreme Court held that prior felony convictions were sentencing factors that need not be charged in an indictment nor proven beyond a reasonable doubt because they are not elements of the charged offense. *See Almendarez-Torres v. United States*, 523 U.S. 224, 244 (1998). Because neither *Apprendi* nor *Blakely* overruled *Almendarez-Torres*, we held that the district court did not err in considering prior felony convictions when calculating the defendant's sentence. *Pittman*, 388 F.3d at 1109. That rule applies here as well. Harris was sentenced pursuant to the career offender provision of the Guidelines. He did not object to the criminal history information compiled by the probation office. *See* Sentencing Tr. at 5, 7. Indeed, his lawyer affirmatively accepted the calculation. *See* Sentencing Tr. at 7 ("Clearly, the criminal history category is there. There is no dispute over that."). In light of our holding in *Pittman*, Harris's challenge to his sentence fails.

AFFIRMED.

**A true Copy:**

     **Teste:**

                        _____
                        *Clerk of the United States Court of*
                        *Appeals for the Seventh Circuit*