**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 19-1768
_____

EMERSON RICHBURG,
Appellant

v.

SUPERINTENDENT HOUTZDALE SCI;
ATTORNEY GENERAL PENNSYLVANIA
_____

Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 2:15-cv-04748)
U.S. District Judge: Honorable Nitza I. Quiñones Alejandro
_____

Submitted Under Third Circuit L.A.R. 34.1(a)
January 25, 2022
_____

Before: HARDIMAN, SHWARTZ, and FUENTES, <u>Circuit Judges</u>.

(Filed: January 25, 2022)
_____

OPINION[*]
_____

SHWARTZ, <u>Circuit Judge</u>.

_____

[*] This disposition is not an opinion of the full Court and, pursuant to I.O.P. 5.7, does not constitute binding precedent.

Emerson Richburg was convicted of first-degree murder and sentenced to life in prison following a jury trial in the Philadelphia Court of Common Pleas. He appeals the denial of his petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, arguing that his trial counsel was constitutionally ineffective for failing to interview and call three witnesses and to fully cross-examine one witness. Because Richburg's ineffective assistance claims, even viewed cumulatively, are without merit, we will affirm.

I

A

On Valentine's Day 2005, high school student Javon Connor (the "Victim") was beaten, strangled to death, rolled naked in a carpet, and shoved partway through a basement window of an abandoned rowhome in Philadelphia. She was last seen when she entered Richburg's house around 8:00 or 8:30 a.m. No one else entered or exited the house until after 10:00 a.m. Richburg lived with (1) his mother, who was away on vacation at the time; (2) his mother's 65-year old friend, Robert Carter, who woke up and came downstairs for breakfast around 9:30 or 10:00 a.m.; and (3) the Victim's boyfriend, Julian Grant, who was at another person's home smoking crack cocaine from approximately 6:00 a.m. to 11:00 a.m.[1] In other words, Richburg was the only one home

_____

[1] Grant's behavior later in the day was consistent with him not seeing the Victim or knowing her whereabouts on Valentine's Day. He (1) called his sister after school and asked whether the Victim went to school that day, and (2) told the Victim's housemate later that evening that when she does see the Victim, to "tell her he said 'f--- her.'" A219 at 73:2-7.

and awake when the Victim entered the house the morning of her death.

Physical evidence linked the Victim's death to Richburg's house. Pink fibers and green carpeting found entangled in the Victim's hair matched fibers and carpeting recovered from a rough path leading from the exterior of Richburg's house to its basement. Found in Richburg's basement were a telephone cord with the Victim's blood on it, a yellow latex glove with Richburg's DNA on it, carpet backing tape, a mop bucket, and a swept-together pile of debris containing plywood chips and straw that matched debris found on the Victim.

When Carter came downstairs for breakfast, he observed Richburg sweeping and vacuuming the living room carpet and the steps to the basement, which Carter thought was strange because he had never seen Richburg cleaning before. Similarly, Andrew Richardson, a drug dealer working on Richburg's street, saw Richburg taking several trash bags out of the house the day after the murder.

Richburg had a tumultuous relationship with the Victim, and women in general, which eventually led to Richburg's arrest. The Victim referred to Richburg as "fat boy," A224 93:18, and told others that she rejected his sexual advances. Richburg threatened to have the Victim beat up for "running her mouth." A318 at 9:16-20. Richburg also: (1) strangled his aunt with an extension cord on October 6, 2002; (2) cut another aunt with a knife on that same day when she tried to intervene; and (3) beat and strangled his daughter's mother, Tanika Pagan, on March 3, 2005.

The police responded to Richburg's assault on Pagan. Pagan first told the police

3

that Richburg described to her how Grant murdered the Victim, and later that Richburg admitted that he had murdered the Victim. Pagan relayed details about the murder that were not then publicly known, including that the Victim had walked past Richburg's house and then came inside on the morning of her death; that the Victim was wearing a "Baby Phat" coat, which was the same coat her housemate, Denise Leaf, testified the Victim was wearing on the day she was murdered; that the Victim was beaten and dragged down to Richburg's basement; and that the plan was to burn the body, a plan consistent with the bottle of lighter fluid Carter observed on, and police recovered from, Richburg's kitchen counter.

B

Richburg was charged with first-degree murder, unlawful restraint, and abuse of a corpse. At his trial, multiple witnesses testified, including Pagan, who admitted that Richburg confessed to her that he murdered the Victim. After all witnesses testified, the court asked Richburg, "Are there other witnesses you want called?" and Richburg responded, "No." A333 at 69:20-22.

Richburg was found guilty of all charges and sentenced to life in prison without parole.

Richburg appealed, and the Superior Court affirmed. Com. v. Richburg, 961 A.2d 1282 (Pa. Super. Ct. 2008) (Table). The Pennsylvania Supreme Court denied Richburg's petition for allowance of appeal. Com. v. Richburg, 964 A.2d 895 (Pa. 2009) (Table).

C

4

Richburg filed a pro se petition under Pennsylvania's Post Conviction Relief Act ("PCRA"), 42 Pa. C.S. § 9541 et seq., raising numerous claims. A371-402. Appointed counsel filed an amended PCRA petition based upon one claim: Richburg's trial counsel's alleged failure to call an alibi witness. The PCRA court denied the petition, the Superior Court affirmed, Com. v. Richburg, No. 2142 EDA 2014, 2015 WL 7571962 (Pa. Super. Mar. 9, 2015), and the Supreme Court denied allowance of appeal, Com. v. Richburg, 118 A.3d 1108 (Pa. 2015) (Table).

D

Richburg then petitioned for federal habeas relief. The District Court referred the petition to a Magistrate Judge. The Magistrate Judge issued a report and recommendation, concluding, among other things, that Richburg's counsel was not ineffective for failing to call his purported alibi witness and that his "remaining . . . twenty-six [] claims of counsel ineffectiveness," including "'cumulative' misconduct," were procedurally defaulted, A20–22. The District Court adopted the report and recommendation and denied both Richburg's petition for a writ of habeas corpus and a certificate of appealability.

Richburg appeals, and we granted a certificate of appealability to review his claims that his trial counsel rendered ineffective assistance by: (1) failing to interview and call the purported alibi witness as well as two other witnesses who he claims would have all impeached Pagan's credibility; and (2) failing to impeach Pagan with a prior crimen falsi conviction and the fact that she may have expected favorable treatment in

5

exchange for her testimony. We also granted the request to expand the certificate to consider whether these alleged errors cumulatively prejudiced Richburg.[2]

## II[3]

### A

Ordinarily, a habeas petitioner must either exhaust his claims by "fairly present[ing]" them at each available level of the state courts, Lines v. Larkins, 208 F.3d 153, 159-161 (3d Cir. 2000), or show cause for his failure to meet the exhaustion requirement, Martinez v. Ryan, 566 U.S. 1, 10 (2012). In Martinez, for example, the Supreme Court held that ineffective assistance of counsel at initial-review state collateral proceedings may constitute such cause. Id. at 9. Richburg concedes that several of the issues he presents to us were not presented to the state courts, but "we need not address the issue of exhaustion" here because each of Richburg's claims lack merit. Roman v. DiGuglielmo, 675 F.3d 204, 209 (3d Cir. 2012) ("Because we will deny [the petitioner's] claims on the merits, we need not address the issue of exhaustion in this case."); see also 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.").

---

[2] We will grant the Government's unopposed motion to expand the record to include certain documents presented to the state court.

[3] The District Court had jurisdiction under 28 U.S.C. § 2254(a). We have jurisdiction under 28 U.S.C. §§ 1291 and 2253(a). We exercise plenary review over the District Court's order because the Court did not hold an evidentiary hearing. Simmons v. Beard, 590 F.3d 223, 231 (3d Cir. 2009).

Similarly, although our standard of review varies depending upon whether the state court "adjudicated . . . the merits" of Richburg's claims, Johnson v. Williams, 568 U.S. 289, 292 (2013) (quoting 28 U.S.C. § 2254(d)); Breakiron v. Horn, 642 F.3d 126, 131 (3d Cir. 2011), we need not address whether the state court adjudicated them because, even on de novo review, his claims lack merit. We are, however, required to presume that the state court's factual findings are correct "unless rebutted by clear and convincing evidence." Simmons v. Beard, 590 F.3d 223, 231 (3d Cir. 2009) (citing 28 U.S.C. § 2254(e)(1)).

B

To succeed on an ineffective assistance claim, a petitioner must show that (1) "[his] counsel's performance was deficient;" and (2) "the deficient performance prejudiced the defense." Strickland v. Washington, 466 U.S. 668, 687 (1984). An attorney's performance is deficient when it "[falls] below an objective standard of reasonableness under prevailing professional norms." Collins v. Sec'y of Pa. Dep't of Corr., 742 F.3d 528, 546 (3d Cir. 2014) (quotation marks omitted). To establish prejudice, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. A reasonable probability is "a probability sufficient to undermine confidence in the outcome" of the trial. Strickland, 466 U.S. at 694. In assessing these elements, we must "consider the totality of the evidence before the . . . jury." Id. at 695.

7

Richburg argues ineffective assistance concerning his trial counsel's failure to call three witnesses and failure to use certain evidence to impeach Pagan. We address each claim in turn.

1

Richburg argues that his trial counsel was ineffective for failing to interview and call Jamie Roeder to impeach Pagan's testimony. Roeder is now Richburg's sister-in-law and would have testified that Pagan told her that Pagan falsely implicated Richburg only "because she was told [by police] . . . that [Richburg]'s DNA was found in that dead girl[']s body." A456.

Failing to interview or call Roeder was neither deficient performance nor prejudicial. The police allegedly told Pagan that Richburg's DNA was found on the Victim. Richburg claims that Roeder would have testified that this caused Pagan to falsely accuse Richburg of the crime. Pagan, however, was cross-examined on this subject, and therefore, the jury had the opportunity to weigh the impact of her statements on her credibility. As a result, Roeder's proffered testimony that Pagan said she lied about Richburg's confession would have been cumulative. Second, calling Roeder would have opened the door to testimony that Richburg told Roeder to "lie to [the police] about the time [she] was with him on Valentine's Day" to establish an alibi, as Roeder had previously told the police. A439-40. The jury could have viewed such request as the effort of "a guilty man" to tamper with a witness, Collins, 742 F.3d at 549, and thus serve as further incriminating evidence against Richburg. Given the potential harm of Roeder's

8

proffered testimony, we cannot say that the failure to interview or call her fell below an objective standard of reasonableness. See Hess v. Mazurkiewicz, 135 F.3d 905, 908 (3d Cir. 1998) (holding counsel's failure "to call [a witness] to testify regarding alleged inconsistencies in the victims' accounts . . . was a reasonable trial strategy, [given that the] testimony would alert the jury to" information harmful to the defendant).[4]

Further, the evidence against Richburg would have been unaffected by Roeder's testimony, and thus Richburg was not prejudiced by her absence. Roeder's testimony would not have undermined the fact that an eye-witness saw the Victim enter Richburg's house the morning of her murder, that Richburg was the only person awake at the house when the Victim entered,[5] that Richburg was seen cleaning the house and taking out trash the day after the murder, that Richburg's DNA was found on a latex glove in Richburg's basement near a phone cord with the Victim's blood on it, and that pink fibers, green carpeting, wood chips, and straw found in Richburg's home were also found on the

---

[4] The state court also aptly noted that Richburg's ineffective assistance claim concerning Roeder failed "for a[nother] reason," that is, "[d]uring defendant[']s trial[,] defendant was asked if he wanted any witnesses called in his defense[,] and he indicated that he did not," constituting a "knowing, voluntary, and intelligent decision concerning trial strategy [that bars him from] later be[ing] heard to complain trial counsel was ineffective on the basis of that decision." A477 (citing Com. v. Paddy, 800 A.2d 294, 316 (Pa. 2002)). To allow Richburg to now complain after making such a decision "would allow [him] to build into his case a ready-made ineffectiveness claim to be raised in the event of an adverse verdict." Paddy, 800 A.2d at 316.

[5] Richburg no longer asserts that his counsel was ineffective for not offering Roeder's testimony to provide an alibi. This makes sense as the proffered testimony that Roeder picked up Richburg from his house to purchase marijuana the morning of the murder did not rule out that Richburg had time to commit the murder.

9

Victim. Given the physical and testimonial evidence against Richburg, we cannot say there is a reasonable probability that the verdict would have been different had Roeder testified.

Thus, Richburg's ineffective assistance claim concerning Roeder fails.

2

Richburg argues that trial counsel was ineffective for failing to interview and call Edwin Aquino as a witness to challenge the Government's theory that Richburg killed the Victim and hid the body by himself, because Aquino "witnessed three men dumping a roll of carpet in a basement window around the time [the Victim] went missing," Appellant Br. at 38-40. While Aquino's testimony would have placed others with the body, it also could have constituted an eye-witness to Richburg's disposal of the body and thus we cannot say that trial counsel's decision not to call Aquino fell below an objective standard of reasonableness. See Duncan v. Morton, 256 F.3d 189, 200-01 (3d Cir. 2001) (observing that where "testimony would have been more harmful than helpful to . . . [the] defense, we cannot find [trial counsel's] failure to call [the witness]" constituted constitutionally deficient performance). Moreover, Richburg was not prejudiced by Aquino's absence because Aquino could neither offer testimony concerning who murdered the Victim nor discredit the other evidence that implicated Richburg.

Thus, Richburg's ineffective assistance claim concerning Aquino fails.

3

Richburg argues that trial counsel was ineffective for failing to seek to enforce the subpoena to call S.C. as a witness to impeach Pagan. Richburg contends that Pagan admitted to S.C. that Pagan lied about Richburg's confession. Had S.C. testified, however, the testimony would have also opened the door to testimony that Pagan told Richburg's aunt that Richburg confessed. Given this risk, it was reasonable for counsel not to pursue S.C.'s testimony.[6] Further, as explained above, the Commonwealth's additional evidence makes it difficult to say there is a reasonable probability that the verdict would have been different had Richburg's trial counsel called S.C. as a witness.

Thus, Richburg's ineffective assistance claim concerning S.C. fails.

4

Richburg argues that trial counsel was ineffective because he failed to cross-examine Pagan about a retail theft conviction and her expectation of favorable treatment in exchange for her testimony. Richburg concedes, however, that the conviction occurred

---

[6] Moreover, Richburg explicitly agreed not to call S.C. The court addressed Richburg on the record saying that "[S.C.] did not appear and she was apparently served by the defense. She was given notice that she was to be here, and . . . [s]he has not shown up, and it is my understanding that you do not wish to have her testify; is that correct?" A332-33 at 68:18-69:6. Richburg responded, "Yes, Your Honor." A333 at 69:7. The court reminded Richburg that he had a right to have her appear, and confirmed that Richburg "discussed this with [his] lawyers and [Richburg still] d[id] not wish to get her involved or have her testify." A333 at 69:8-14. Again, Richburg confirmed, "Yes." A333 at 69:15. It seems implausible that Richburg would have waived his right to call this witness if her testimony would have been as helpful as he now urges. Moreover, as stated previously, to allow him to now complain "would allow [him] to build into his case a ready-made ineffectiveness claim to be raised in the event of an adverse verdict." Paddy, 800 A.2d at 316.

11

after the trial.  Thus, trial counsel could not have cross-examined Pagan on the conviction because it had not yet occurred.

Richburg nonetheless argues that Pagan's retail theft case was pending during the time of Pagan's trial testimony, so Pagan should have been cross-examined about that arrest.  There is, however, a question whether cross-examination about an arrest is permitted under the Pennsylvania Rules of Evidence.  See Com. v. Brown, 673 A.2d 975, 979–80 (Pa. Super. 1996) (holding that the trial court erred by admitting impeachment evidence of a witness' prior theft arrest, but that the error was harmless).  Even if such questioning were allowed, the jury would have been required to conclude that Pagan falsely testified that the father of her child committed first-degree murder in hopes of avoiding the consequences of her retail-theft arrest.  Trial counsel's decision not to pursue this line of questioning in the hope that the jury would reach this unlikely conclusion did not fall below an objective standard of reasonableness.  See United States v. Harris, 394 F.3d 543, 557 (7th Cir. 2005) (finding no ineffective assistance where trial counsel "[p]erhaps . . . did not want to dwell on a witness who brought forward . . . damning [evidence]").[7]

In addition, Richburg was not prejudiced by his trial counsel's decision because

---

[7] Richburg's argument that "it is possible that Pagan was still on probation" at the time of the retail theft incident and her testimony, and "[i]f so," then Pagan also may have been facing potential probation violations, Reply Br. at 15-18, is speculative.  See Harris, 394 F.3d at 555 (concluding that trial counsel was not ineffective for failing to call a witness when "on this record we are unable to determine . . . what [the witness's] testimony would have been").

12

the unchallenged evidence corroborated Pagan's recitation of what Richburg told her about the murder, including that the Victim had come to his house, what she was wearing, what he did to her, what he did with her body, and what he planned to do next (i.e., set the Victim's body on fire). Given the evidence introduced at trial, which corroborated the events Pagan said Richburg described, we cannot say there is a reasonable probability that the verdict would have been different had Pagan been cross-examined on her retail theft arrest.

Thus, Richburg's ineffective assistance claim concerning Pagan fails.

5

Finally, Richburg argues that, cumulatively, trial counsel's above-mentioned errors prejudiced Richburg, as "[a]ll of trial counsel's errors involved a failure to challenge the testimony of Tanika Pagan, . . . the only witness who implicated Richburg as [the Victim]'s killer." Appellant Br. at 52-55.

The "cumulative-error analysis merely aggregates all the errors that individually have been found to be harmless, and therefore not reversible, and it analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless." Albrecht v. Horn, 485 F.3d 103, 139 (3d Cir. 2007). "Cumulative errors are not harmless if they had a substantial and injurious effect or influence in determining the jury's verdict, which means that a habeas petitioner is not entitled to relief based on cumulative errors unless he can establish actual prejudice." Id. (quotation marks and citations omitted).

13

Here, trial counsel did not err, nor did his decisions cumulatively prejudice Richburg. Even if examining Pagan about her retail theft arrest and the testimony of Roeder, Aquino, and S.C. wholly discredited Pagan's testimony, the evidence still demonstrates that (1) Richburg had motive (the Victim declined his advances and disparaged him); (2) Richburg had opportunity (he was the only person home and awake at the house when the Victim was last seen entering the morning of her death); (3) Richburg had means (he had strangled another woman in the past); and (4) Richburg was linked to the murder by physical evidence (his DNA was found on the latex glove in his basement near the phone cord with the Victim's blood on it, and debris found on the Victim's body matched debris found in his basement). See Albrecht, 485 F.3d at 139 (holding no cumulative error when the evidence showed that the defendant "had a motive," that "there was physical evidence against him," and that the defendant "made numerous serious threats to a variety of people that he would kill [the victim]").[8] Thus, Richburg's cumulative error claim is without merit.

## III

For the foregoing reasons, we will affirm the District Court's order.

---

[8] In fact, trial counsel's decisions likely helped Richburg by preventing the jury from hearing that (1) Richburg asked Roeder to lie to police to create an alibi, (2) Aquino recognized Richburg as one of the men disposing of the body, and (3) Pagan also told her aunt that Richburg confessed to the murder.